**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRIANNE T. O'DONNELL,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   20-cv-3841** |
| | : | |
| **MARTIN O' MALLEY,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OPINION</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                              April 1, 2024

Plaintiff Brianne T. O'Donnell filed this action pursuant to 42 U.S.C. § 405(g) seeking

review of the Commissioner of the Social Security Administration's decision denying her claim

for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42

U.S.C. §§ 1381-1383f.  This matter is before me for disposition upon consent of the parties.  For

the reasons set forth below, Plaintiff's Request for Review is **DENIED**.

## I.      PROCEDURAL HISTORY

On September 7, 2018, Plaintiff protectively filed an application for SSI, alleging

disability beginning on December 5, 1986, due to migraines, posttraumatic stress disorder,

anxiety, stage 3 to 4 endometriosis and epilepsy, including related symptoms of twitching/jolts,

mental slowness, dizziness/fatigue, forgetfulness, and nausea.  (R. 9, 179, 182).  Plaintiff's

application was denied on February 15, 2019, and she requested a hearing before an

Administrative Law Judge (ALJ).  (R. 94-99).  Plaintiff, represented by counsel, appeared and

testified at the October 1, 2019 hearing, as did a vocational expert (VE).  (R. 34-74).  On

November 25, 2019, the ALJ issued a decision unfavorable to Plaintiff.  (R. 6-27).  Plaintiff

appealed, and the Appeals Council denied his request for review on June 26, 2020, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 1-5).

On August 7, 2020, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania.  (Compl., ECF No. 1).  After receiving multiple extensions, Plaintiff filed her Brief and Statement of Issues in Support of Request for Review on August 3, 2022 (Pl.'s Br., ECF No. 36), and the Acting Commissioner at the time, Andrew Saul, after receiving his own extension, filed his response on October 3, 2022.  (Resp., ECF No. 41).  On 11, 2022, Plaintiff filed a reply brief.  (Reply Br., ECF No. 42).  On September 19, 2023, this case was reassigned from United States Magistrate Judge David R. Strawbridge to me, and on October 16, 2023, Plaintiff consented to my jurisdiction.  (Order, ECF No. 43; Consent, ECF No. 46).

## II.    FACTUAL BACKGROUND[1]

The Court has reviewed the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on June 5, 1986, and she was six months old on her alleged disability onset date.  (R. 179).  She completed twelfth grade and cosmetology school.  (R. 183).  Plaintiff previously worked as a receptionist in an automobile service shop, a hairdresser, a waitress and in medical billing.  (*Id.*).

### A.    Medical Evidence

On August 28, 2016, Plaintiff presented to Aria Health (Aria) in Philadelphia due to a

---

[1]  Because Petitioner's claims implicate only her seizure disorder and related impairments, I discuss only the evidence pertaining to this condition.

seizure and had a second one while in the emergency room (ER) there.  (R. 300).  An MRI
showed left frontal cortex encephalomalacia and chronic pituitary microadenoma, but Plaintiff
declined an EEG.  (*Id.*).  The neurology department prescribed Keppra and contacted the
Department of Transportation to advise that Plaintiff not drive for six months or until medically
cleared.  (*Id.*).  She was directed to obtain an EEG and follow up with Neurology.  (*Id.*).  She
returned to Aria on April 27, 2017, due to another seizure lasting 10 minutes followed by
postictal (i.e., post-seizure) symptoms.  (R. 294).  Plaintiff reported that she had only ever had
two seizures previously, "years ago and on the same day," in both instances when she stopped
taking her valium.  (*Id.*).  She stated that she had not followed up with Neurology as directed
because she had not had any additional seizures.  (*Id.*).

On June 19, 2017, Plaintiff told her primary care physician Jonathan B. Levyn, D.O., that
she had been having seizures for a "few weeks."  (R. 631).  She stated she had had one "big"
seizure after discontinuing her medications after only one month.  (R. 632).  The treatment note
continues: "Had several seizures recently; off all meds; had one per month since April."  (*Id.*).
She was advised to make an appointment with the neurology department.  (R. 633).  At a July 18,
2017 follow up, it was noted that she would "see neuro 8/18."  (R. 629).  On August 10, 2017, it
was recorded that she had had a seizure the prior night and that she would now be "seeing Neuro
next week," although there is no record of any such visit.  (R. 622).  On October 6, 2017,
Plaintiff stated that her seizures were triggered by anxiety and was taking Cymbalta.  (R. 620).

On December 5, 2017, after having a seizure at work, Plaintiff presented to the Abington
Memorial Hospital ER, where she had another seizure.  (R. 376).  After being admitted, she
"expressed multiple episodes of noncompliance, namely to only taking her medication once a
day when it is supposed to be taken twice a day, and other days missing the medication
completely.  Long discussion was had regarding the importance of compliance and the role

Keppra did in preventing her seizures."  (R. 377).  She was discharged after one day in the hospital.  (R. 376).

On April 11, 2018, Plaintiff received an initial evaluation from Sarah Zubkov, M.D., at Temple Neurology in Philadelphia.  (R. 457).  Plaintiff reported that "she's had 14 seizures total," with the first occurring in 2015, followed by no seizures "for some time."  (*Id.*).  However, the following page notes "17 seizures in two years," with the last occurring on March 23, 2018.  (R. 458).  It was noted that seizure "[i]ntensity seems to have increased over time." (*Id.*).  The progression of an individual seizure was described as: "left eye twitching/odd sensation/abduction movement or out-of-body feeling->within seconds LOC [loss of consciousness]->tonic-clonic convulsion ~5 min or longer. Postictal confusion for 15 min."  (R. 458).  Plaintiff reported tongue-biting without incontinence but with pain afterwards.  (*Id.*).  She further reported "[i]solated out-of-body feelings[ ] [a] few times a month" and "mild nausea" with Keppra.  (*Id.*).  Dr. Zubkov noted that per the Plaintiff's father she can have status epilepticus with convulsions lasting greater than five minutes, sometimes with back-to-back seizures.  (*Id.*).  Plaintiff stated her belief that bad anxiety and her periods provoked the seizures. (*Id.*).  Dr. Zubkov suspected that Plaintiff's seizures were "focal in onset . . . likely temporal" and discussed with her the role of the "many medications to treat this condition . . . ."  (R. 463-64).  She prescribed Clonazepam for the auras and oxcarbazepine (Trileptal) and directed Plaintiff to wean herself off the Keppra and obtain bloodwork.  (R. 464).  She advised Plaintiff to avoid dangerous situations, including driving.  (*Id.*).

Plaintiff returned to Dr. Zubkov on May 29, 2018.  (R. 448).  Dr. Zubkov noted that Plaintiff had not obtained bloodwork as directed.  (*Id.*).  She added: "She is currently having menses and hasn't had seizures. . . .  Frequency of convulsions has improved, but auras have worsened somewhat."  (*Id.*).  EEG results were reported as generally normal.  (R. 454).  Plaintiff

4

was directed to return in four months.  (R. 455).

On November 22, 2018, Plaintiff presented to the Aria ER with chest pain after she had "two unwitnessed seizure episodes" overnight.  (R. 490).  She reported that the seizures had worsened her shortness of breath.  (*Id.*).  Same-day discharge notes indicate that her pain was likely secondary to her seizures.  (R. 493).

On November 28, 2018, Plaintiff received an Internal Medicine Examination from Faranak Dabir, M.D.  (R. 547-61).  Plaintiff described seizures with symptoms consistent with those reported to Dr. Zubkov.  (R. 547).  She further claimed that the frequency of her seizures had increased and that she also had associated short-term memory problems.  (*Id.*).  She acknowledged that she sometimes forgets to take her medications.  (*Id.*).  Dr. Dabir diagnosed "[s]eizures, uncontrolled" and "short-term memory impairment/confusion."  (R.550).  She opined that Plaintiff could work at the medium exertional level but with no exposure to unprotected heights or moving mechanical parts.  (R. 550, 556).

On December 4, 2018, Plaintiff again visited Dr. Levyn.  (R. 616).  The treatment note refers to her two same-day November 2018 seizures, as well as an earlier three-day stay in the hospital for status epilepticus.  (R. 616).  Seizure triggers included "stress [and] staring at screens or tv for too long."  (*Id.*).  She also had "aura; vision in left eye changes[;] has partial onset seizures into tonic-clonic."  (*Id.*).  She called Dr. Levyn's office on December 13, 2018 to inquire about obtaining more Klonopin to deal with her auras but was advised to contact her neurologist or, if necessary, the ER.  (R. 614).

On January 3, 2019, Plaintiff underwent a mental status consultative examination by Lan Yang, Psy.D.  (R. 562-571).  Plaintiff stated that "she is very anxious about seizures among other things" and avoids social settings and loud noises because of them.  (R. 563).  She reported that since her seizures began she has experienced concentration and short-term memory problems.

(*Id.*).  Upon examination, her attention/concentration and recent/remote memory skills were "slightly impaired."  (R. 564).  Dr. Yang assessed no limitations in understanding, remembering and carrying out simple instructions; mild limitations in the ability to make judgments on simple work-related decisions and in understanding, remembering and carrying out complex instructions; and moderate limitations in the ability to make judgments on complex work-related decisions, responding appropriately to usual work situations and to changes in a routine work setting, and in interacting appropriately with the public, supervisors, and coworkers.  (R. 567-68).

Plaintiff returned to Temple Neurology on January 9, 2019, seven months after her prior visit.  (R. 668).  She saw Ching Tsao, M.D., who had replaced Dr. Zubkov as Plaintiff's treating neurologist.  (*Id.*).  Dr. Tsao noted that Plaintiff had been prescribed Lamictal in December, but that she had not obtained bloodwork and an MRI as directed.  (R. 669).  Plaintiff reported loss of peripheral vision in her left eye.  (*Id.*).  Dr. Tsao diagnosed her with "likely focal epilepsy (possibly right frontal or right temporal) with ongoing breakthrough seizures . . . ."  (R. 674).  She planned to "cross taper" Plaintiff's Lamictal and Trileptal (increasing the former and decreasing the latter) "for improved tolerability and seizure control."  (*Id.*).  She again directed Plaintiff to obtain bloodwork and an MRI.  (*Id.*).

On January 18, 2019, State agency medical consultant David Hutz, M.D., opined that Plaintiff must avoid concentrated hazards like machinery and heights and could never climb ladders, ropes, and scaffolds, although she could frequently climb ramps and stairs.  (R. 87-89).

On February 15, 2019, State agency psychological consultant Richard Small, Ph.D., opined that Plaintiff had no limitations in understanding, remembering or applying information and mild limitations in interacting with others, adapting or managing oneself, and understanding, remembering, or applying information.  (R. 85).

Plaintiff next visited Dr. Tsao on May 14, 2019, when she noted that Plaintiff had still not obtained bloodwork or an MRI, and that Plaintiff had stopped taking Lamictal due to dizziness and Klonopin because she had lost the prescription.  (R. 660).  Her seizure log reflected monthly seizures since February.  (*Id.*).  A nighttime seizure on May 4, 2019, involving urinary incontinence was noted, with increased auras since the seizure.  (*Id.*).  Plaintiff also reported periodic "jumping" of her body while falling asleep, although Dr. Tsao stated that it was unclear if this was seizure-related.  (*Id.*).  Dr. Tsao again directed Plaintiff to obtain an MRI, as well as an inpatient video-EEG.  (R. 665).  She diagnosed "[e]pilepsy undetermined as to focal or generalized, intractable."  (R. 667).

On August 20, 2019, Plaintiff returned to Dr. Tsao's office, where she reported seizures occurring approximately one month and five days earlier.  (R. 649).  Prior to that, in early June, she had two episodes in which she experienced eye twitching and/or "not feeling right," but she immediately took Klonopin and did not experience a seizure.  (R. 650).  Plaintiff reported being afraid that she would injure her eyes during a seizure due to prior reaching in that direction when seizing.  (*Id.*).  She also stated that recent episodes had begun with right- rather than left-eye twitching.  (R. 656).  Dr. Tsao noted that the attempt to cross-taper Plaintiff to Lamictal had not worked due to ongoing dizziness.  (*Id.*).  She added: "she still requires MRI and inpatient video-EEG."  (*Id.*).

On August 23, 2019, Plaintiff presented to Temple University's Jeanes Hospital with "breakthrough seizures."  (R. 796-97).  The Neurology Inpatient Consult Notes states that she had "had 4 in the last 2-3 months."  (R. 797).  Seizure symptoms were consistent with those previously described.  (*Id.*).  The note added: "She has been referred for additional outpatient testing in the recent past including MRI brain and EEG which have not been scheduled or performed."  (*Id.*).  However, a CT performed in the ER "showed previously unseen left frontal

lobe encephalomalacia." (*Id.*).  The following day, Plaintiff underwent an MRI of her head and neck.  (R. 915).  Findings included "no restricted diffusion" but "encephalomalacia and glossis involving the left middle central gyrus posteriorly, extending to the centrum semiovale likely from prior infarct."  (R. 917).

On August 27, 2019, after being discharged from the hospital, she followed up with Dr. Levyn.  (R. 612).  She reported having seizures over the last three years, "[n]ot witnessed, usually starts with aura, rt eye droopy, flutters, can't control and passes out.  Pos LOC, has had incontinence and tongue biting."  (*Id.*).  She was also "stumbling with words" during the visit. (*Id.*).  Dr. Levyn directed her to follow up with Neurology.  (R. 613).

Approximately three weeks after the administrative hearing, on October 21, 2019, Dr. Tsao completed a "Seizures Residual Functional Capacity Questionnaire" form prepared by Plaintiff's counsel.  (R. 923-29).  She recorded that Plaintiff has three-minute-long "local to secondary generalized" "focal to bilateral tonic-clonic seizures" with loss of consciousness one to two times per month, including with the last three occurring between late July and late August 2019.  (R. 925).  She noted that Plaintiff "only occasional[ly]" has a warning that a seizure is imminent, with no precipitating factors, and that the seizure occurs within a "few seconds," preventing her from taking safety precautions, such as loosening tight clothing and clearing the area of hard and sharp objects.  (R. 926).  However, the seizures occur overnight or in the early morning.  (*Id.*).  Postictal symptoms included confusion, exhaustion, muscle strain, and lack of alertness and normally last 15 minutes.  (R. 926-27).  Longer-lasting symptoms included depression, memory problems, anxiety and "feel[ing] fatigued for at least 1 day."  (R. 926, 928). She noted that during prior seizures Plaintiff had injured herself and lost control of her bladder. (R. 927).

Dr. Tsao wrote that ONFI (clobazam) "seems to be helping," but other medications did

not or were not well-tolerated.  (*Id.*).  She claimed that Plaintiff was compliant with her

medications.  (*Id.*).  She opined that Plaintiff's seizures would disrupt her ability to work, require

additional supervision and prevent her from working at heights or with machinery or operating a

motor vehicle.  (R. 927).  She further opined that Plaintiff can take the bus alone but should wear

a medical bracelet.  (*Id.*).  She predicted that Plaintiff would require one to two unscheduled 30-

minute breaks per workday and miss about three days of work per month due to her seizure

disorder.  (R. 928).  She restricted Plaintiff to low-stress jobs because "stress tends to cause

[illegible] anxiety and sleep deprivation, which can lead to seizures."  (*Id.*).

     **B.**     **Non-Medical Evidence**

     The record also contains non-medical evidence.  Plaintiff completed an Adult Function

Report on October 6, 2018, in which she indicated that in the past year she had "had 20 seizures

along with sleep seizures as well."  (R. 194).  She reported that at least one of these seizures was

due to forgetting to take her medication.  (R. 198).  She explained that during seizures she loses

consciousness, her eyes roll back in her head, and she falls to the floor, convulses heavily for two

to five minutes, bites and bloodies her tongue and loses control of her bladder; however, she has

had ones where she remains conscious for the first minute, which leaves her feeling anxious.  (R.

194, 200).  During "sleep seizures," she convulses, loses bladder control and scratches her eyes

and face.  (R. 194-95, 201).  She maintained that fear of having a "sleep seizure" keeps her

awake "most nights."  (R. 195).  She cannot drive to due to her epilepsy, and she further stated

that it prevents her from going out alone.  (R. 197-99).  Reading may cause "seizure auras," and

stress is one of her "seizure triggers."  (R. 198, 200).  She checked boxes indicating, *inter alia*,

that she has problems with memory and concentration, which she attributed to her epilepsy.  (R.

199).  Plaintiff claimed that her hearing and eyesight have worsened after every seizure she has

had.  (*Id.*).  In the final "Remarks" section of the form, she repeated various injuries she has

received during seizures, such as "tearing" her shoulder, banging her head and burning her arm. (R. 201).  She stated that during her December 15, 2017 hospitalization she went into status epilepticus, required emergency oxygen and nearly died, leading to three days of hospitalization. (*Id.*).  She claimed to "have turned blue and stopped breathing during every seizure after."  (*Id.*).

Around this time, Plaintiff also completed a "Witness Statement" that recounts much of the information contained in her Adult Function Report.[2]  (R. 202-08).  She additionally explained the impact of her epilepsy on prior jobs.  (R. 204-05).  Following a seizure, she will "sleep for days."  (R. 207).  She reported that "[s]ince my epilepsy diagnosis my fatigue has become unbearable," requiring frequent and/or lengthy naps.  (R. 206).  She reported fatigue lasting "all day, everyday."  (R. 208).

At the October 1, 2019 administrative hearing, Plaintiff testified that she does not drive or take public transportation due to her epilepsy.  (R. 47).  She stated that her December 2016 seizure was due to taking her medication late, although she claimed to have taken it as prescribed every day since.  (R. 48-49).  She later added that she stopped taking one of her medications due to dizziness.  (R. 54).  She claimed to sleep for four days following a seizure.  (R. 54).  She reported that her auras consisted of "eye twitching" and "feeling out of body" and were brought on by loud noises like vacuums and hair dryers.  (R. 58).

## III.    LEGAL STANDARD

To be eligible for benefits under the Act, a claimant must demonstrate to the

---

[2]  The record also contains a letter from Plaintiff's former fiancé.  (R. 239-40).  This letter primarily described what happens to Plaintiff when she experiences a seizure, including injuries she has suffered.  (R. 239).  It also briefly discussed the effects of her epilepsy on her work history.  (R. 240).

Commissioner that she cannot engage in substantial gainful activity because of a medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §

1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, then the
> Commissioner considers in the second step whether the claimant has
> a "severe impairment" that significantly limits his physical or
> mental ability to perform basic work activities.  If the claimant
> suffers a severe impairment, the third inquiry is whether, based on
> the medical evidence, the impairment meets the criteria of the
> impairment listed in the "listing of impairments," . . . which result
> in a presumption of disability, or whether the claimant retains the
> capacity to work.  If the impairment does not meet the criteria for a
> listed impairment, then the Commissioner assesses in the fourth step
> whether, despite the severe impairment, the claimant has the
> residual functional capacity to perform his past work.  If the
> claimant cannot perform his past work, then the final step is to
> determine whether there is other work in the national economy that
> the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. § 416.920(a)(4).  The

disability claimant bears the burden of establishing steps one through four.  If the claimant is

determined to be unable to resume previous employment, the burden shifts to the Commissioner

at step five to establish that, given the claimant's age, education, work experience, and mental

and physical limitations, she is able to perform substantial gainful activities in jobs existing in

the national economy.  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

     Judicial review of a final decision of the Commissioner is limited.  A district court is

bound by the factual findings of the Commissioner if they are supported by substantial evidence

and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.

1999).  Substantial evidence is "more than a mere scintilla," and "such relevant evidence as a

reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118

(3d Cir. 2000) (citations omitted).  The Third Circuit has instructed, "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).  Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The Court has plenary review of legal issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).


**IV.    ALJ'S DECISION**

In her decision, the ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since September 7, 2018, the application date (20 CFR 416.971 et seq.).

2.    The claimant has the following "severe" impairments: epilepsy with headaches, obesity, depression, and anxiety disorder (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; can never climb ladders, ropes, or scaffolds; must avoid all exposure to hazards including moving machinery and unprotected heights; must avoid more than frequent exposure to humidity, wetness, dust, odors, fumes,

pulmonary irritants, temperature extremes, and vibration; and is limited to unskilled work with routine, repetitive tasks performed in a low stress environment (defined as no frequent changes in the work setting), with no more than occasional interaction with the public, co-workers or supervisors.

5.   The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.   The claimant was born on June 5, 1986 and was 32 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.   The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since September 7, 2018, the date the application was filed (20 CFR 416.920(g)).

(R. 9-23).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 23).


## V.   DISCUSSION

Plaintiff raises two claims in her request for relief: (1) The RFC does not properly

account for the plaintiff's seizure disorder, and (2) the ALJ failed to properly credit the opinion

of the plaintiff's treating neurologist, Dr. Tsao. (Pl.'s Br., ECF No. 36, at 3).

### A. Seizure Disorder

After detailing the evidence surrounding Plaintiff's seizure disorder, the ALJ

summarized:

> The claimant's impairments reasonably cause some limitations, but
> not to the extent alleged. The claimant's seizures occurred
> infrequently unless the claimant was non-compliant with her
> prescribed medication. The claimant told her neurologist that she
> had a seizure in March 2018, but not again [until] November 2018;
> she reported that she had the "feeling" like she might have a
> seizure during her menses, but she did not have any seizure activity
> (Exhibit 15F/21). For 4 months in 2019, a time where she
> documented monthly seizures, she stopped taking Lamictal and
> was taking extra Trileptal because she reportedly lost her Klonopin
> prescription (Exhibit 15F/10). She had two seizures again in the
> summer of 2019 after she stopped taking Lamictal (Exhibit 15F/1).
> Her neurologist also recommended that she undergo laboratory
> testing, MRI imaging, EEG studies, and regular follow up care
> (Exhibit 5F/1, 10, 20; 15F/1, 20, 20), yet the claimant often did not
> comply (Exhibits 5F/1, 20; 14F/18; 15F/1, 10, 20).

(R. 19).

### 1. The Parties' Positions

Plaintiff posits that her RFC fails to account for the fact, otherwise acknowledged by the

ALJ, that she has seizures even when compliant with her treatment. (Pl.'s Br., ECF No. 36, at 3-

4, 8). After recounting the background law[3] regarding the need for the RFC (and resulting

hypothetical to the VE) to include all medically established limitations, she points to evidence

---

[3] Both parties set forth additional background law regarding the scope of the Court's
review, standards under the Act, and the duty of the ALJ, as opposed to medical sources, to
determine disability. (Resp., ECF No. 41, at 3-5; Reply, ECF No. 42, at 2-4). Because this
background law is well-settled (notwithstanding each side's attempt to characterize it in his or
her favor), this Court does not further discuss it, except as otherwise addressed herein.

describing her seizures as "uncontrolled," "ongoing" and "intractable," meaning that they are "resistant to cure, relief or control," "unresponsive to therapy or intervention," or "not easily relieved or cured."  (*Id* at 4-5, 8 (citing R. 550, 667, 674, 920) (additional citations to dictionaries omitted)).  Citing the regulations, Social Security Rulings and the Social Security Program's Operation Manual System (POMS), Plaintiff calculates that "light work" requires her to stand and/or walk between 2.6 and 6 hours per day, purportedly putting her at risk of physical harm if she were to have a seizure while climbing ramps or stairs as permitted by the RFC or even while sitting or standing at her workstation.  (*Id.* at 6-8 (citing 20 C.F.R. §§ 416.967(a)-(b); SSR 83-10; SSR96-9p; POMS DI 25001.001)).

The Commissioner counters that the ALJ cited ample evidence in support of her decision – including Plaintiff's earlier medical history, administrative medical findings, Dr. Dabir's medical examination, the efficacy of Plaintiff's treatment, and the inconsistency, at times, between Plaintiff's treatment notes and subjective statements – and explained how Plaintiff's seizures occurred only "infrequently," except during periods when she was noncompliant with her treatment.  (Resp., ECF No. 41, at 7 (citing R. 19-21)).  He asserts that the ALJ's statement of reasons for the decision permits judicial review and that Plaintiff fails to identify evidence compelling a contrary result.  (*Id.* at 7-8 (citations omitted)).  He insists that the ALJ appropriately determined that Plaintiff, a younger person who can perform at least light work as determined by the ALJ and multiple medical sources, overstated the disabling effects of her seizure disorder.  (*Id.* at 8).  The Commissioner maintains that Plaintiff merely speculates that walking and standing can be dangerous to a person with seizure disorder without pointing to any supporting evidence and that a diagnosis alone does not suffice to prove disability.  (*Id.* at 8-9 (citation omitted)).

Plaintiff replies that even if she overstated the frequency of her seizures, like the ALJ

determined, they were nonetheless not accounted for in the RFC, which exposed her to "obvious hazards." (Reply, ECF No. 42, at 2, 6 n.7). She excerpts Dr. Dabir's discussion of her seizures from the doctor's opinion but claims that she did not mention it in her opening brief because Dr. Dabir did not, in Plaintiff's view, address her seizures "to any significant degree . . . ." (*Id.* at 5 (citing R. 547). She highlights an apparent error by Dr. Dabir regarding the date of her prior Abington Hospital ER visit and contends that although the corresponding medical record mentions Plaintiff's noncompliance with treatment, Dr. Dabir allegedly did "not deem [it] significant enough to mention in h[er] report." (*Id.* at 6 (citing R. 458, 547)). However, she concedes that Dr. Dabir found that she "[s]ometimes forgets to take her medication." (*Id.* at 6 n.7 (citing R. 547)). Nonetheless, she suggests that the ALJ exaggerated the evidence of noncompliance because the Abington Hospital ER record "appears to be the only medical evidence where seizures are attributed to non-compliance" and "the only exhibit the ALJ cites" for this point. (*Id.* (citing R. 18)). She further points to Dr. Dabir's diagnoses of "seizures, uncontrolled" and short-term memory issues, otherwise largely "unremarkable" examination results, and conclusion that Plaintiff could perform "medium" (reduced by the ALJ in the RFC to "light") exertional work without exposure to unprotected heights or moving machine parts, while footnoting that such form reports without additional explanation are only "weak evidence." (*Id.* at 6-7 & n.6 (citing R. 20-21, 550, 552-57) (case citation omitted)).

Plaintiff denies that it is speculative that a person who has a seizure – "possibly as frequently as twice a day," based on her reading of the evidence – while climbing a ramp or stairs may lose consciousness and injure him or herself. (*Id.* at 7-8). She claims that it is "self-contradictory" that her RFC does not permit her to be near unprotected heights but allows her to climb stairs up to two-thirds of the workday. (*Id.* at 8 (citing POMS DI 25001.001)). Citing a medical journal, Plaintiff posits that falling on stairs is a "major cause of injury," even for people

16

who do not experience seizures.  (*Id.* at 8 n.8 (citation omitted)).  She also reiterates that the ALJ

never found that her seizures occurred *only* when she was noncompliant with her treatment, just

that they occurred "infrequently" if she was compliant.  (*Id.* at 7-8).

> **2.     Analysis**

After the step three listings determination, an ALJ must make an RFC assessment before

moving to steps four and five of the disability evaluation.  *See* 20 C.F.R. § 404.1520(a)(4);

*Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  An RFC assessment

determines "what an individual can do in a work setting in spite of the functional limitations and

environmental restrictions imposed by all of his or her medically determinable impairment(s)."

SSR 83-10, 1983 WL 31251, at *7.  The ALJ must include all credibly established limitations in

the RFC.  *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (citing *Chrupcala v. Heckler*,

829 F.2d 1269, 1276 (3d Cir. 1987)).

"While an ALJ bears the burden of crafting an RFC, it is the claimant's burden to

establish that her conditions result in functional limitations and disability."  *Penn v. Berryhill*,

No. CV 17-922, 2018 WL 2365432, at *3 (W.D. Pa. May 24, 2018).  However, "the fact that [a]

[p]laintiff suffers from a particular medical condition does not alone translate to evidence of a

particular work-related limitation."  *See id.* (finding that ALJ did not err in allegedly failing to

consider claimant's medical condition where claimant failed to present evidence that the

condition resulted in any limitations in the workplace); *see also Rodriguez v. Berryhill*, No. 17-

6884-KM, 2019 WL 1013343, at *12 (D.N.J. Mar. 1, 2019) (refusing to remand where claimant

did "not identify any specific limitations . . . that the ALJ failed to consider in the RFC") (citing

*Burden v. Colvin*, 191 F. Supp. 3d 429, 459 (M.D. Pa. 2016)).

Distilled to its essence, Plaintiff's argument is that her RFC permitting frequent standing

and walking, particularly in the form of climbing ramps and stairs, fails to account for the

possibility that she may suffer a seizure while doing so and thereby subjects her to an

unacceptable risk of physical harm.  (Pl.'s Br., ECF No. 36, at 8 ("Under the RFC she is not to be

around, 'hazards including moving machinery and unprotected heights.' But she can climb ramps

and stairs. If she had a seizure, and lost consciousness near the top of a flight of stairs, it would

not matter if there were protective railings on either side of the stairs.") (footnote omitted);

Reply, ECF No. 42, at 8 ("If she is standing [when she has a seizure], she is at risk of injury. If

she is climbing stairs, which under the RFC she might be doing frequently[,] . . . she [is] at

greater risk of being hurt.")).  However, Plaintiff's argument is misplaced because courts

routinely uphold RFCs permitting frequent engagement in these activities by claimants with

seizure disorders.[4]  *See, e.g., Goff v. Barnhart*, 421 F.3d 785, 789, 792-93 (8th Cir. 2005)

(upholding RFC permitting claimant with a history of seizures to stand and/or walk up to six

hours per day); *Blackwell v. Saul*, No. 1:19-1781-SVH, 2020 WL 967443, at *17 (D.S.C. Feb.

27, 2020) (upholding RFC permitting claimant with seizure disorder to frequently climb ramps

and stairs); *Vasquez v. Colvin*, No. 1:11–cv–01899–SKO, 2015 WL 1347371, at *9, 11 (E.D.

Cal. Mar. 24, 2015) (upholding RFC permitting claimant with seizure disorder to sit, stand and

walk for up to eight hours per day with no limits on climbing ramps and stairs).

 Plaintiff points to medical records indicating, and the ALJ's own acknowledgment, that

she continued to have seizures even with treatment, (Pl.'s Br., ECF No. 26, at 5 (citing R. 19,

550, 667, 674, 920)), but substantial evidence nonetheless supports the ALJ's RFC finding that

---

[4] Plaintiff's related contention that her seizure disorder prevents her from
"[e]ven . . . sitting or standing at a workstation" is equally without merit.  (Pl.'s Br., ECF No. 36,
at 8).  If her seizures do not stop her from climbing ramps and stairs, they do not stop her from
being at a workstation.  Moreover, Plaintiff's assertion is tantamount to a claim that having
seizure disorder compels a finding of disability, yet she does not allege that the ALJ erred at step
three when she determined that Plaintiff had not met the listing for epilepsy (Listing 11.02).

they were sufficiently managed for Plaintiff to work full-time at the determined exertional level, as long as she took her medications as prescribed. *See Stover v. Colvin*, Civ. No. 12–531, 2013 WL 2446469 *3 (W.D. Pa. June 5, 2013) ("the standard of review . . . is not whether there is evidence to establish Plaintiff's position, but, rather, [ ] whether there is substantial evidence to support the ALJ's finding") (citing *Allen v. Bowen*, 881 F.2d 37, 39 (3d Cir. 1989)).  As the ALJ explained, Plaintiff had seizures at approximately eight-month intervals in 2016 and 2017 (August 2016, April 2017, December 2017), during which period "[s]he admitted to multiple episodes of medication non-compliance."  (R. 16 (citing Exs. 2F/1, 37 & 4F)).  She had another seizure in March 2018.  (*Id.* (citing Ex. 5F/10)).  The ALJ added that Plaintiff was seizure-free while taking her prescribed medications for approximately eight months in 2018, before a recurrence on Thanksgiving.  (R. 17 (citing Ex. 9F), 19 (citing Ex. 15F/21)).  Her May 2019 seizure log showed monthly seizures over the last four months; however, the ALJ observed that Plaintiff reported having stopped taking her Lamictal and Klonopin.  (R. 18 (citing Ex. 15F/10)).  She had two additional seizures that summer while continuing not to take her Lamictal.  (*Id.* (citing Ex. 16F)).  The ALJ also highlighted multiple instances in which Plaintiff failed to follow up with a neurologist, obtain prescribed bloodwork or undergo an MRI, despite being directed to do so.  (R. 16-19).  Based on the cited medical records, substantial evidence supports the ALJ's decision.

This body of evidence also belies Plaintiff's contention that her December 2017 Abington Hospital ER records (Exhibit 4F, R. 376-447) are the only evidence of her noncompliance with treatment cited by the ALJ.  (*See* Reply, ECF No. 42, at 6 n.7).  Moreover, even if some cited records do not expressly tie Plaintiff's seizures to noncompliance, "[t]he failure to follow through with prescribed courses of treatment is a factor that the ALJ may consider in assessing the severity of an impairment."  *See Honkus v. Colvin*, No. 2:13CV1830, 2015 WL 225391, at

*16 (W.D. Pa. Jan. 16, 2015).  Plaintiff's contentions regarding Dr. Dabir's opinion are likewise

unavailing.  She submits that Dr. Dabir gave her seizures no "significant" consideration, but

Plaintiff's own quotation of Dr. Dabir's full-paragraph discussion of them refutes this assertion.

(Reply, ECF No. 42, at 5 (citing R. 547)).  She conjectures that Dr. Dabir did not specifically

discuss her noncompliance with treatment because she viewed it as generally insignificant, but

even this questionable assumption requires one to ignore the fact that Dr. Dabir highlighted

Plaintiff's forgetfulness about taking her medication.  (R. 547).  Further, she complains that Dr.

Dabir's checked-box form opinion without accompanying explanation is "weak evidence at

best," (Reply, ECF No. 42, at 6-7 n.8 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.

1993))), but it is clear from the ALJ's decision that she did not rely heavily upon Dr. Dabir's

findings in making the disability determination.  Indeed, the ALJ addressed Dr. Dabir's seizure-

related findings only very briefly, (R. 17 ("She complained of seizures while awake and

sleeping. After a seizure, she was confused and lethargic, up to a whole day.")), and she did not

cite them alongside the other relevant medical evidence in her summary paragraph explaining

that Petitioner's seizures did not limit her to the extent alleged.  (R. 19).

Accordingly, the Court denies Plaintiff's request for remand on this basis.

**B.      Dr. Tsao's Opinion**

Regarding Dr. Tsao's opinion, the ALJ stated:

> In October 2019, Dr. Tsao reported that the claimant had 1-2
> generalized seizures per month, each lasting 3 minutes, associated
> with postictal confusion, exhaustion, poor memory, and muscle
> strain for approximately 15 minutes. The doctor opined that the
> seizures will likely disrupt the work of coworkers, and the claimant
> requires more supervision than unimpaired workers. She cannot
> work at heights, with power machines, or operating a motor
> vehicle. She can use public transportation independently. She
> needs to take 1-2 unscheduled 30-minutes breaks per workday, and
> will be absent 3 days per month (Exhibit 18F). This opinion is not
> persuasive. Although Dr. Tsao is the claimant's treating

neurologist and supported her opinion w[ith] an explanation for her
reported limitations (Exhibit 18F), her opinion is wholly
inconsistent with the evidence as a whole, including her own
treatment records. Dr. Tsao's extreme limitations, including the
claimant's need for additional supervision, the need to take
unscheduled breaks, and the need for absences is not supported by
the limited subjective reports of postictal symptoms or the seizure
frequency noted in the neurological records (Exhibits 5F; 15F).

(R. 21).

### 1.      The Parties' Positions

Plaintiff offers a detailed summary of Dr. Tsao's opinion and the other seizure-related

evidence, excerpts the foregoing discussion of it by the ALJ, and sets forth 20 C.F.R. §

416.920c(b)-(c) governing articulation of consideration of medical opinions.  (Pl.'s Br., ECF No.

36, at 9-27 (citing R. 21, 264, 294, 300, 303, 329, 376-77, 446, 449, 454-55, 457-58, 463-65,

485-546, 572-97, 611-14, 618, 620, 622, 630-32, 649-50, 656, 660, 667, 669, 674, 689-92, 708-

909, 920, 922-29) (additional citations omitted)).  She questions whether Dr. Tsao's finding that

Plaintiff would miss work three days per month is an "extreme limitation" like the ALJ

concluded, claiming that she suffers monthly seizures sometimes accompanied by urinary

incontinence and tongue-biting as well as more frequent auras that leave her feeling unwell.  (*Id.*

at 27).  She suggests that it is not "reasonable" to expect her to work the rest of the day or the

following day after experiencing a seizure or aura.  (*Id.*).  She casts as "absurd" the ALJ's

"extreme limitation" conclusion as applied to her need to take unscheduled breaks,

acknowledging that she does not have daily auras but adding that when she does, she must take

medication and wait to see if the aura progresses to a seizure.  (*Id.* at 27-28).  She concludes

therefore that she must take unscheduled breaks "with some frequency," even if not daily.  (*Id.*).

Regarding Dr. Tsao's determination that Plaintiff would require additional supervision, she

insists that this is also not an "extreme limitation" but rather "a logical conclusion" because any

employer "would certainly want to have someone monitoring [Plaintiff] through the day, to make sure she was safe." (*Id.* at 28). She also takes issue with the ALJ's determination that Dr. Tsao's opinion is inconsistent with the record "as a whole," noting that district courts require ALJs to articulate in detail how a doctor's opinion (and especially a treating one's) is inconsistent with the record and that the Supreme Court requires administrative agencies to clearly disclose their grounds for decisions. (*Id.* at 15, 28 (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)) (additional citations omitted)).

The Commissioner responds that substantial evidence supports the ALJ's treatment of Dr. Tsao's opinion. (Resp., ECF No. 41, at 9). After highlighting the changes to how opinion evidence is considered and its persuasiveness articulated, as set forth in 20 C.F.R. § 416.920c, he summarizes the ALJ's reliance upon Dr. Dabir's and the State agency consultants' opinions, while noting that she nonetheless reduced Plaintiff's exertional level from medium to light after receiving new evidence at the hearing regarding Plaintiff's continuing seizure activity. (*Id.* at 10 (citing R. 20, 76-89, 547-57)). Regarding Dr. Tsao's opinion, the Commissioner points out that the regulations no longer direct ALJs to give any particular weight to treating source opinions but instead focus their attention on supportability and consistency. (*Id.* at 11 (citing 20 C.F.R. §§ 404.1520c, 416.920c)). He refutes that the ALJ was required to rely upon Dr. Tsao's inconsistent post-hearing medical source statement prepared for litigation purposes. (*Id.* at 10). He observes that although the ALJ found that Dr. Tsao supported her opinion with an explanation, it was inconsistent with the record evidence, including Dr. Tsao's own treatment notes, Plaintiff's reported symptoms, her seizure frequency and her noncompliance with treatment. (*Id.* at 11 (citing R. 19, 21)). The Commissioner denies that the ALJ was required to more specifically discuss any countervailing evidence and maintains that she reasonably articulated the bases for her decision as required under currently applicable standards. (*Id.* at 11-

12 (citing 82 Fed. Reg. 5844-01, at 5858) (additional citations omitted)).  He argues that Plaintiff

merely seeks an improper reweighing of the evidence.  (*Id.*).

In reply, Plaintiff concedes that despite Dr. Tsao's specialization as a neurologist and

familiarity with Plaintiff's seizure disorder, the ALJ was not required to credit her opinion.[5]

(Reply, ECF No. 42, at 9).  Nonetheless, she repeats her claim that the ALJ improperly rejected

Dr. Tsao's opinion based on the record "as a whole" without articulating particular

inconsistencies.  (*Id.*).  Pointing to the extensive factual summary in her opening brief, Plaintiff

maintains that the ALJ could not have made this purported error if she had engaged in such an

exercise in her decision.  (*Id.*).  She reiterates that an ALJ must articulate the supportability and

consistency of medical opinions, including those from a treating source.  (*Id.* at 9-10 (citing

*Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022))).  She laments that "[t]he

regulations seem to direct ALJs to omit part of their reasons for making a decision, from the

written decision," thereby depriving the court of a sufficient basis for judicial review pursuant to

42 U.S.C § 405(g).  (*Id.* at 10).  In any event, she allows that "we do not need to reach that issue"

of whether the regulations comport with § 405(g) because, in this case, the ALJ allegedly failed

to sufficiently articulate how Dr. Tsao's opinion was inconsistent with the record.  (*Id.*).

## 2.   Analysis

The Commissioner modified the Social Security regulations in 2017, changing the way

ALJs evaluate medical evidence.  The prior regulations, which govern claims filed before March

27, 2017, divided medical sources into three categories:  treating, examining, and non-examining.

*See* 20 C.F.R. § 404.1527.  ALJs were to weigh each medical opinion and could sometimes afford

---

[5]  Without further elaboration, Plaintiff also states: "One might say that Dr. Dabir
accepted the seizure disorder . . . ."  (Reply, ECF No. 42, at 9).  The Court is unclear of the
import of this statement and does not address it further.

controlling weight to opinions from treating sources.  *See id.*

Under the new regulations, ALJs do not place medical sources into these categories and can no longer afford controlling weight to any opinion.  *See* 20 C.F.R. § 404.1520c(a).  Instead, ALJs now evaluate the persuasiveness of each medical opinion and each prior administrative medical finding.  *See id.*  Five factors determine persuasiveness:  (1) supportability; (2) consistency; (3) relationship with the claimant, including length, purpose, and extent of the treatment relationship, as well as frequency of examinations and whether the medical source examined the claimant firsthand; (4) specialization; and (5) other factors, like "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  20 C.F.R. § 404.1520c(c).  Supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).  The ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [her] determination or decision."  *Id.*  The ALJ need not explain her determinations regarding the other factors, but she must discuss supportability and consistency.  *Id.*

Regarding supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  Regarding consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).

It is well established that an ALJ is free to reject a medical source opinion but in so doing

must indicate why evidence was rejected so that a reviewing court can determine whether "significant probative evidence was not credited or simply ignored." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). An ALJ must consider all pertinent medical and non-medical evidence and "explain [any] conciliations and rejections," *Burnett*, 220 F.3d at 122, but he or she need not discuss "every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004), Accordingly, "[t]he ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for [her] conclusion sufficient to enable meaningful judicial review." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (quoting *Burnett*, 220 F.3d at 120).

Plaintiff seizes upon the ALJ's finding that Dr. Tsao's opinion was not consistent with the record "as a whole" to contend that the ALJ failed to sufficiently articulate consistency as required by 20 C.F.R. § 416.920c(b)(2).  (Pl.'s Br., ECF No. 36, at 15, 28 (citations omitted); Reply, ECF No. 42, at 9).  However, the ALJ did not stop with this statement.  Citing the medical evidence from Temple Neurology, she specified that the opinion was inconsistent and/or unsupported by Dr. Tsao's own treatment records, the seizure frequency reflected in the neurological records and Plaintiff's limited subjective reports of symptoms occurring immediately after her seizures.  (R. 21 (citing Exs. 5F, 15F)).  The ALJ also discussed these records in greater detail over the preceding four pages of the decision, noting along the way that Plaintiff sometimes went up to eight months without a seizure but had them more frequently when not taking her medication as prescribed.  (R. 16-20 (citations omitted)).  For example, citing the May 2018 records, the ALJ pointed to generally normally EEG results and that "the frequency of her convulsions improved."  (R. 17).  While Plaintiff rehashes this body of evidence in even greater detail in her opening brief, (Pl.'s Br., ECF No. 36, at 15-27), an ALJ is not required to recount every bit of evidence.  *Hur*, 94 F. App'x at 133.  Here, the ALJ adequately

25

"explain[ed] how [she] considered the supportability and consistency of [the] medical opinions in the record," including Dr. Tsao's, as required by § 416.920c(b)(2) and cases interpreting it. *See Loucks*, 2022 WL 2189293, at *2 (cited by Plaintiff).

Plaintiff further takes issue with the ALJ's characterization of certain limitations determined by Dr. Tsao – Plaintiff's purported need for additional supervision, one to two unscheduled 30-minute breaks per workday and three absences per month – as "extreme." (Pl.'s Br., ECF No. 36, at 27). But the ALJ's conclusion has the support of substantial evidence. As the ALJ explained, the proffered limitations are not consistent with or supported by Plaintiff's seizure frequency or postictal symptoms. (R. 21 (citing Exs. 5F, 15F)). As has been repeatedly noted herein, Plaintiff often went up to eight months without a seizure, and more frequent seizures tended to coincide with periods of medication noncompliance. As for postictal symptoms, even Dr. Tsao opined that they normally lasted only 15 minutes (following seizures normally lasting three minutes). (R. 926). Accordingly, the ALJ was justified by the record in rejecting these limitations.

Plaintiff's arguments to the contrary are a mix of conjecture and conclusory assertions. She posits that it is "logical" that she would require someone to "monitor[ ]" her throughout the workday to ensure her safety, (Pl.'s Br., ECF No. 36, at 28), but the ALJ was warranted in rejecting such a limitation because her seizures only occurred every few months (or more infrequently) with medication compliance and the RFC already included postural and environmental limitations that reduced her risk of injury in the event of a seizure, such as no climbing of ladders, ropes, and scaffolds and no exposure to moving machinery and unprotected heights. (R. 15). As for her purported need for one to two unscheduled half-hour breaks each day, even Plaintiff acknowledges that this would be unnecessary since she does not have daily auras, let alone seizures. (Pl.'s Br., ECF No. 36, at 27-28). She maintains with no further

specificity that she would still need such breaks "with some frequency," but this hardly supports

Dr. Tsao's "daily" limitation.  Lastly, she fails to explain why her relatively infrequent seizures

would warrant three days of absence each month.

Based on these reasons, the Court declines to remand this matter on the asserted ground.


**VI.     CONCLUSION**

For the reasons set forth above, Plaintiff's Request for Review is **DENIED**.


BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge